# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MARTHA JO DORGAN**                                **CIVIL ACTION**

**VERSUS**                                                   **NO:        04-0221**

**MAYSON FOSTER, ET AL**                       **MAGISTRATE JUDGE**
                                                                 **KAREN WELLS ROBY**

## ORDER AND REASONS

Before the Court is defendant **Mayor Mayson Foster's Motion for Summary Judgment (doc. # 29)** and defendant **City of Hammond's Motion for Summary Judgment (doc. # 32)**.  The defendants seek summary judgment dismissing all of the claims of plaintiff Martha Jo Dorgan.  Dorgan filed opposition motions.   The parties consented to have the case tried before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.      Factual and Procedural Background

### A.      The Underlying Facts

Martha Dorgan , the former City of Hammond's Airport Director alleges that twenty six days after becoming Mayor, Mayson Foster eliminated the Airport Director's position immediately terminating her without a pre or post termination hearing.  The elimination of her position was allegedly done in concert with the Director of Administration, Dr. Martis Jones, and the Director of Personnel, Loretta Severan, on January 27, 2003.

Dorgan alleges that during the termination, Mayor Foster stated that her job duties were being transferred to the City Building Inspector, Pete Panepinto, a male under the age of 40. According to Dorgan, he was unqualified for the position of Airport Director.  Two days later, the Mayor publically announced that he was restructuring city government.

 Dorgan contends that the restructuring was not legal because the City of Hammond's Charter requires the submission of proposed restructuring  to the Hammond City Council for approval. Yet, according to Dorgan, Mayor Foster failed to submit a reorganization plan to the City Council suggesting that his decision to terminate her was pre-textual.

On January 29, 2003, Dorgan challenged her termination in state court by filing a Petition for Declaratory Judgment and Injunctive Relief which included a request for a temporary restraining order ("TRO").[1]  The state court granted her  request for a TRO and she was restored to her position as Airport Director pending a determination of the suit on whether a permanent injunction should be issued.

While she was returned to the position of Airport Director, Dorgan alleges that Mayor Foster stripped her of her duties, refused to communicate with her, and took steps regarding the airport without consulting  her.  She contends instead that he sought the advice of a male on airport related matters, namely the Chairman of the Airport Advisory, Sonny Yokum.[2]

However, despite Mayor Foster's refusal to include her in the day to day operations of the Airport, Dorgan contends that she continued to perform her job satisfactorily.  She alleges, however,

---

[1]The Petition was filed in the 21st Judicial District Court in Tangipihoa Parish.

[2]Dorgan wrote a letter on February 7, 2003 to the Mayor regarding Yokum's unauthorized use of electrical power from one of the hangars.  She informed the mayor of the activity, that she corrected it, and issued a delinquency notice to Yokum for non-payment of his hangar rental. (See Pl. Ex. 13A).  The mayor followed up and confirmed that Yokum was using the electricity and further requested that he pay the delinquent hangar rental for January and February. (See Pl. Ex. 13B).  July 17, 2006

that functioning under these conditions caused her severe stress and anxiety requiring medical treatment.

In addition to being ignored by Foster, Dorgan contends that the Personnel Director, Loretta Severan, accused her of smelling of alcohol at a meeting, a fireable offense.  Immediately after the accusation, Dorgan requested the opportunity to disprove the allegation by submitting to a sobriety test.  However, Severan did not require any testing, instead she suggested to Dorgan that she was only personally concerned about her.

After having her position eliminated, being ignored by Mayor Foster, being reinstated to the position by court order, and then being accused of smelling of alcohol, Dorgan believed that her termination was imminent.  She therefore resigned from the position on April 24, 2003, which she contends amounted to constructive discharge.[3]

In September of that same year she was replaced by another male, Byron Hudgins, who was 30 years old.[4]  Hudgins was hired as the new Airport Director and worked for the City for one year.  According to Dorgan, the Mayor cited to Hudgins's youth as a factor in his decision to select him as the new Airport Director.  Hudgins was then replaced by another male under 40.

B.    **The Administrative Proceeding and the Federal Complaint**

Dorgan filed her initial charge of discrimination four days after she alleges her constructive discharge took place.  In the initial charge filed with the Louisiana Commission on Human Rights ("LCHR") and the Equal Employment Opportunity Commission ("EEOC") Dorgan alleges that she

---

[3]Resignation email from Dorgan.  (*See* Pl. Ex. 18).

[4]Dorgan contends that Yokum advised Foster and the City Council at a public meeting on June 6, 2003, that they should delay the appointment of a male to the position of Airport Director to avoid the appearance of gender discrimination.

was discriminated against on the basis of her sex.[5]  She also alleges that after being reinstated to her

position, she was subjected to a hostile work environment resulting in her forced resignation. (*See*

Def. Ex. 36).  On  November 1, 2003, her counsel requested that the EEOC issue Dorgan a right to

sue letter as the matter remained pending. (*See* Pl. Ex. 2).  On December 3, 2003, the Civil Rights

Division of the Department of Justice issued Dorgan a right to sue letter.  (*See* Def. Ex. 39).

     On January 26, 2004, Dorgan filed a complaint in this Court alleging that she was

discriminated against on the basis of her age and sex in violation of state and federal anti-

discrimination laws.  (*See* Rec. Doc. No. 1).  Dorgan further alleges that the defendants deprived her

of her property interest in continued employment in violation of Title 42 U.S.C. § 1983 and that the

defendants intentionally inflicted emotional distress in violation of Louisiana state law.  *See id.*

     After filing the lawsuit, Dorgan  realized that she had not alleged in her charge to the EEOC

that she was discriminated against on the basis of her age.  On May 18, 2004, she sent a letter to the

EEOC seeking to supplement and amend her charge by asserting age discrimination as an additional

basis. (*See* Pl. Ex. 3).  She formally submitted a new charge of age discrimination on June 14, 2006,

and further alleged that her employer, the City of Hammond retaliated against her because she filed

a previous charge of discrimination. (*See* Pl. Ex. 7).

     The EEOC offered to mediate the dispute. (*See* Pl. Ex. 6).  The EEOC  closed the  inquiry

thirty days later and destroyed the documentation in accordance with EEOC Order No. 201. (*See*

Def. Ex. 38).  An amended right to sue letter regarding Dorgan's Age discrimination claim was

therefore never issued by the agency.

     The City of Hammond and Mayor Foster filed the subject motions seeking dismissal of

---

[5]  The initial charge was filed on April 28, 2003.

Dorgan's claims contending that:  (1) Dorgan's age discrimination claim should be procedurally dismissed because she failed to allege an age discrimination claim in the EEOC charge which is a jurisdictional prerequisite before seeking relief in this court; (2) Dorgan's state law age discrimination claim should be procedurally dismissed because she never presented notice of the claim;  and (3) Dorgan's  age and sex discrimination claims should be substantively dismissed because the defendants had a non-discriminatory reason for eliminating the position and she voluntarily resigned.  Foster contends that (4)  Dorgan's claims against  him should be dismissed because he is not an employer as defined by federal and state discrimination law.  Finally, the defendants contend that (5) Dorgan's §1983 claim should be dismissed because she does not have a vested property right in continued employment and she cannot point to a policy that was violated; and (6) Dorgan's claim of intentional infliction of emotional distress is not sufficient as a matter of law.

## II.    <u>Standard of Review</u>

Summary judgment is proper if the evidence shows the existence of no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of informing the Court of the basis for its motion and "identifying those portions . . . of the record which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp v. Catrett,* 477 U.S. 317, 323 (1986).  A party is entitled to summary judgment only if the pleadings, depositions, answers to interrogatories, admissions and affidavits before the court at the time of summary judgment show that there is no genuine issue of material fact. *See Fields v. City of Southern Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

Once the moving party carries its burden of proving that there is no material factual dispute, the burden shifts to the non-movant "to show that summary judgment should not lie." *Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994).  While the Court must consider the evidence with all reasonable inferences in the light most favorable to the non-movant, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions, on file,' designate 'specific facts showing that there is a genuine issue of fact for trial.'" *Celotex Corp.*, 477 U.S. at 324.  If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *See Szabo v. Errisson*, 68 F.3d 940, 942 (5th Cir. 1995).  Further, there is no requirement in Rule 56 that a court "sift through the record in search of evidence" to support the nonmovant's position.  *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.).

## III.   Analysis

### A.   Dorgan's Discrimination Claims

#### 1.   Scope of Charge and Federal Complaint

The defendants contend that Dorgan's age discrimination claim should be dismissed because she failed to include an age discrimination claim in her charge to the EEOC and an age discrimination complaint is not necessarily expected to grow out of a sex discrimination charge. Therefore, they contend that Dorgan's age discrimination claims are procedurally barred.

Dorgan contends that her age discrimination claims are not procedurally barred because she amended her charge to include an age discrimination charge after the City appointed 30 year old Byron Hudgins to the position of Airport Director in September of 2003.  Dorgan contends that she promptly notified the EEOC that she wanted to assert an age claim on June 1, 2004, and before the City appointed Hudgins to the position, her claim was not ripe.  She further contends that her proposed amendment was timely as it was submitted within 300 days from the last discriminatory act and that the EEOC acknowledged receipt of the amendment but closed the case in error.

She contends that she gave the EEOC the information needed to investigate her charge of age discrimination but the EEOC closed her file because she allegedly did not give them additional information.  Consequently, Dorgan contends that  her federal complaint seeking damages for age discrimination is appropriate because she timely filed an amended charge with the EEOC.

Preconditions to bringing suit under the Age Discrimination in Employment Act ("ADEA") include the requirement that "a person seeking relief under the ADEA must first file an administrative charge with the EEOC." *Julian v. City of Houston*, 314 F.3d 721,725 (5th Cir. 2002). In a "deferral" state like Louisiana, an aggrieved person has 300 days from the date of the last act of discrimination to file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1); *see Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001); *Huckabay v. Moore,* 142 F.3d 233, 238 (5th Cir.1998); *Messer v. Meno,* 130 F.3d 130, 134 & n. 2 (5th Cir.1997).[6]

---

[6]A deferral state has state laws prohibiting discrimination in employment along with a a state agency charged with granting or seeking relief for such discriminatory practice.  *Clark v. Resistoflex Co.,* 854 F.2d 762, 765 n. 1 (5th Cir.1988).  The Louisiana Commission on Human Rights has been funded and operating since April 1994, making Louisiana a deferral state since that time. LA.REV.STAT.ANN. § 51:2233; G. Guidry, Employment Discrimination Claims in Louisiana, 45 La. B.J. 240, 241 (Oct.1997); *Nelson v. Shoney's, Inc.,* CIV.A.96-2199, 1997 WL 567957, at *7 (E.D.La. Sept. 10, 1997) (applying 300-day statute of limitations to complaint of race discrimination in Louisiana); *Vaughn v. Amtrak Transp. Serv.,* CIV.A.95-3570, 1996 WL 363448, at *1 n. 5 (E.D.La. July 1, 1996) (holding claim untimely if 300-day statute of limitations applies in Louisiana).  Although the Fifth Circuit has not yet ruled that Louisiana is a deferral state, it has repeatedly applied the 300-day statute of limitations in cases arising in Louisiana.

As is the case with Title VII actions, ADEA litigants must base their civil suit on the contents of the charge of discrimination filed with the EEOC.  *See Jupiter v. Bellsouth Telecommunications, Inc.*, CIV.A.99-628, 1999 WL 1009829 at *4 (E.D.La. Nov. 5, 1999); 29 C.F.R.  § 1601.12(b). Generally, the courts take a permissive view in relaxing formalistic requirements of limiting the complaint to the strict terms of the charge.  Recognizing both the remedial purpose of Title VII and the ADEA, and the fact that the charge is typically filed by unsophisticated workers, the courts developed a broad standard to determine the proper scope of a charge-based civil complaint.[7]

This standard was first set forth by the Fifth Circuit Court of Appeals in *Sanchez v. Standard Brands, Inc*.  *See* 431 F.2d 455, 2 (5th Cir. 1970).   The *Sanchez* Court held that allegations in a complaint that are "like or related" to the allegations in the EEOC investigation which may reasonably be expected to grow out of the  charge of discrimination may be encompassed within the federal complaint.  *Id.*

In  *Sanchez,* the Court reasoned that the civil suit is "much more intimately related to the EEOC investigation than to the words of the charge."  *Id.*  In other words, the principal goal of the charge filing requirement is to commence the EEOC investigatory and conciliation processes, not to trigger a federal court  action.  The Fifth Circuit also emphasized its rejection of overly formalistic pleading concepts as applied to the typical charging parties "who are unlettered and unschooled in the nuances of literary draftsmanship."  *Id.*; *see also Pachecho v. Mineta* 448 F.3d 783 (5th Cir.

---

[7]Filling out the EEOC Intake Questionnaire has been held to meet the requirement of a charge. *Casavantes v. California State University, Sacramento*, 732 F.2d 1441, 17 Ed. Law Rep. 471, 34 Fair Empl. Prac. Cas. (BNA) 1336, 34 Empl. Prac. Dec. (CCH) ¶34384 (9th Cir. 1984). Other written documents that sufficiently "identify the parties and describe generally the action or practice complained of" have been held to constitute a charge. *Waiters v. Robert Bosch Corp*., 683 F.2d 89, 29 Fair Empl. Prac. Cas. (BNA) 401, 29 Empl. Prac. Dec. (CCH) ¶32888 (4th Cir. 1982). Documents mailed to the EEOC in Washington or any of its offices will qualify. *See* 29 C.F.R. § 1601.8 (1988) Texas, which is a deferral state. *See, e.g., Messer,* 130 F.3d at 134 & n. 2; *Griffin,* 26 F.3d at 612; *Washington v. Patlis,* 868 F.2d 172 (5th Cir.1989); *Urrutia v. Valero Energy Corp.,* 841 F.2d 123, 125 (5th Cir.1988).

2006).

The record shows that Dorgan's initial charge of discrimination filed on April 28, 2003 only asserted sex discrimination.  However, the record further shows that the EEOC acknowledged she filed a formal charge of discrimination on June 1, 2004 and then drafted an EEOC Form 5 Charge of Discrimination which detailed her age discrimination charge.  (*See* Pl. Ex. 7).  The EEOC asked her to review the document, make corrections if necessary, and initial the corrections.  She was further instructed to date and sign the form and return the document in the postage  paid envelope provided by the EEOC.  (*See* Pl. Ex. 6).

The evidence shows that Dorgan received the form, made handwritten changes and signed the form as requested by the EEOC. (*See* Pl. Ex. 7, dated June 14, 2004).  Yet  the agency closed her file on July 29, 2004.  While the evidence received by the Court suggests that Dorgan complied with the EEOC's request for information, it is unclear just exactly why her file was closed but it appears that the agency was in error.

The charge of age discrimination was submitted and received by the agency on June 1, 2004, 260 days after the alleged act giving rise to the amendment and within the time limit set forth in 42 U.S.C. § 2000e-5(e)(1).  Therefore, Dorgan's charge of age discrimination was timely and the complaint therefore encompasses a properly filed charge. *See Aucoin v. Kennedy*, 55 F.Supp.2d 830 (E.D.La.,2004)(holding that exhaustion for ADEA filing purposes was sufficient where original charge failed to allege age discrimination but amended charge after suit was filed adequately alleged age discrimination such that the court had subject matter jurisdiction over the ADEA claim). Accordingly, the defendants request to dismiss her age discrimination claim under the ADEA because she failed to file an age charge with the EEOC is denied.

### 2.   Notice of State Law Age Discrimination Claim

Both the City of Hammond and Mayor Foster contend that Dorgan's state law age discrimination claim under Louisiana's Employment Discrimination Law ("LEDL") should be dismissed because she failed to give notice to them before filing her complaint. They further contend that the EEOC charge submitted by Dorgan contains only a sex discrimination charge and provides insufficient notice of the age discrimination claim. Therefore, they argue that her state law age discrimination claim should be dismissed.

Dorgan asserts the same allegations made in response to the challenge of her federal claim of age discrimination; namely that she submitted an amended charge which the EEOC acknowledged it received. She submits that her amended age charge set forth the basis of her state law age discrimination claim, and therefore the defendants had notice of the age claim when she amended the discrimination charge.

Louisiana law provides that a "plaintiff who believes he or she has been discriminated against, and who intends to pursue court action shall give the person who has allegedly discriminated *written notice of this fact at least thirty days before initiating court action*." LA. REV. STAT. 23:303(C). Further, the notice "shall detail the alleged discrimination, and both parties shall make a good faith effort to resolve the dispute prior to initiating court action." *Id*; *see also Mayes v. Office Depot, Inc.*, 292 F.Supp.2d 878, 889 (2003)(holding that "a plaintiff must give the proposed defendant written notice that she believes she has been discriminated against at least 30 days before initiating court action.")

Federal district courts in Louisiana interpreting this notice provision of Louisiana law have consistently held that a claim under the statute must be dismissed if the plaintiff failed to comply

with the notice provision, unless the plaintiff filed a charge of discrimination with the EEOC within the appropriate time period, which effectively accomplished the same goals as the statutory notice under state law. *See Dunn v. Nextel So. Corp.,* CIV.A.01-691-A, 2002 WL 1401673, at *1 (M.D.La. Jan. 8, 2002) (dismissing plaintiff's employment discrimination complaint without prejudice for failure to allege compliance with Section 23:303(C)); *Brown v. Menszer,* CIV.A. 99-0790, 2000 WL 1228769, at *2 (E.D.La. Aug. 23, 2000) (rejecting plaintiff's argument that "vague verbal warning" could substitute for written notice under the previous notice statute and dismissing plaintiff's handicap discrimination claim for failure to comply with notice provision); *Malakoff v. Alton Ochsner Med. Fd.,* CIV.A.99-3603, 2000 WL 805232, at *2 (E.D. La. June 20, 2000) (plaintiff's state law discrimination claim was "procedurally barred" by her failure to comply with Section 23:303(C)).

Dorgan amended her charge of age discrimination on June 1, 2004 which the agency acknowledged receiving on June 14, 2004.   However, her complaint seeking damages for discrimination was filed on January 26, 2004 approximately six months <u>before</u> she sought to amend her charge of discrimination.  Since she initiated the charge after filing the complaint and did not seek to amend the subject complaint so as to satisfy the notice requirement, her state law age discrimination claim is procedurally barred pursuant to Section 23:303(C).   Therefore, the defendants' request to dismiss Dorgan's state law claims of age discrimination is granted.

**3.    <u>Mayor's Capacity to be Sued Under Title VII and the ADEA</u>**

Mayor Foster contends that although it is not clear, he believes that Dorgan may be seeking to hold him responsible for the alleged discrimination in his official and individual capacity.  He contends, however, that whether the claim is being pursued against him in his individual or official

capacity, he is not her employer and therefore the claims filed by Dorgan against him should be dismissed because Title VII and the ADEA only impose liability against employers.

It is well settled that liability under Title VII is directed solely at the employer as opposed to the employees whose acts violate its mandates. *Albright v. City of New Orleans,* CIV.A.96-0679, 2001 WL 725354, *8 (E.D.La.2001). Further, Courts generally interpret the ADEA's definition of employer as they interpret the definition of employer under Title VII. *Kopman v. South Central Bell Telephone*, CIV.A.90-4503, 1992 WL 142390, at *3 (E.D.La. June 17, 1992). Under Title VII and the ADEA, a supervisor is considered an "employer" if he wields the employer's traditional rights, such as hiring and firing. *See Huckabay v. Moore,* 142 F.3d 233 (5th Cir. 1998).

For example, in *Huckabay*, a county commissioner who possessed almost total executive authority within his precinct as well as legislative authority as a member of the commissioners court, wielded sufficient authority to be considered an employer. *Id.* at 241. The Court held that this power is necessarily exercised, however, by a person who acts as an agent of the corporate or municipal body he represents. *Id.*

Because any wrongful acts would be performed in Foster's official capacity, any recovery against him must be against him in this official capacity, not his individual capacity. Further, if Foster acted only in his individual capacity, he did not act as an "employer" and would not be liable under Title VII or the ADEA to the extent that he acted individually. Thus, a public official cannot be held liable in his individual capacity under Title VII or the ADEA. *Id.* at 241. However, contrary to the suggestion of Foster, a public official  may be sued in his official capacity. *See Chustz v. City of New Orleans*, CIV.A.01-3118,  2002 WL 31556353 (E.D.La. Nov. 15, 2002).

Additionally, Foster contends that Dorgan's official capacity claims filed against him should

be dismissed because she is also separately suing the City of Hammond, her actual employer.  He contends that in such instances, courts will generally dismiss actions against agents of a municipality.  Foster relies on two cases for the proposition, *Green v. Administrators of the Tulane Educational Fund*, CIV.A.97-1869, 1999 WL 203262 (E.D.La. April 8, 1999), and *Landry v. Amer. Tel & Tel* CIV.A.97-3583, 1998 WL 832587 (E.D.La. Nov. 25, 1998).  However these cases are distinguishable.

In each case, the discrimination claim was against a private sector employer and a supervisor hired by the employer.  In those instances, the courts noted that the actions of the supervisors were being carried out on behalf of the employer and that only the employer could be held accountable for Title VII violations.

In contrast, this case involves the Mayor of the City of Hammond, not just a supervisor. Section 3-07A(2) of the Hammond City Charter provides that the Mayor is the Chief Executive Officer who has the authority to appoint, suspend or remove all City employees and appointive administrative officers.  (Def. Ex. 12; City of Hammond Personnel Manual at I-1, Def. Ex. 10).  He demonstrated this authority by his attempt to eliminate the position of Airport Director and terminate Dorgan.  Therefore, he too can be considered Dorgan's employer.  Consequently,  the Court finds that the Title VII and ADEA claim against Foster in his official capacity as Mayor  survives, and the his request to dismiss it is denied.  It is granted to the extent that Dorgan seeks to state a discrimination claim against Foster in his individual capacity.

4.     **Capacity of Mayor Foster to be Sued under the LEDL**

Mayor Foster also contends that Dorgan's sex discrimination claim under the LEDL should

be dismissed because he is not her employer under the LEDL.[8]  In support of his position, he cites

to the statutory definition of employer as set forth in Louisiana Revise Statute 23:301 and *Onyeanusi*

*v. Times-Picayune Publishing Corp.,* 485 So.2d 622 ( La. App. 4 Cir. 1986).  He suggests that

because he does not give her compensation, he is not her employer under Louisiana law.

    "Employer" is defined under the LEDL as "a person, association, legal or commercial entity,

the state, or any state agency, board, commission, or political subdivision of the state *receiving*

*services from an employee and, in return, giving compensation of any kind to an employee.*"  LA.

REV. STAT. 23:302(2) (emphasis added).  Courts have interpreted Section 23:302(2)'s definition of

"employer" to apply in cases where employment status is at issue.  *See Jackson v. Xavier University*

*of Louisiana,* CIV.A.01-1659, 2002 WL 1482756 at *6 (E.D.La. July 8,2002) (*citing Jones v. JCC*

*Holding Co.,* CIV.A.01-0573, 2001 WL 537001 (E.D.La.2001).

    In determining whether an employment relationship exists in other contexts, jurisprudence

of this state has uniformly held that the most important element to be considered is the right of

control and supervision over an individual.  *Savoie v. Fireman's Fund Ins. Co.,* 347 So.2d 188

(La.1977); *Cassey v. Stewart* 727 So.2d 655 (La. App. 2d Cir. 1999), *Fuller v. U.S. Aircraft Ins.*

*Group,* 530 So.2d 1282 (La.App. 2d Cir.1988).  For the same reasons cited in the preceding section;

namely that Mayor Foster has the right of control and supervision over Dorgan, and that he has the

ability to terminate her and deny her compensation, he is appropriately considered her employer

within the meaning of Louisiana Revise Statute 23:302.

    Furthermore, the *Onyeanusi* case relied upon by Mayor Foster is distinguishable from the

---

[8]Having determined that Dorgan's state law age discrimination claim should be dismissed as a matter of law, the Court does not reach the issue raised by the Mayor regarding  whether he could be sued in his individual or official capacity as to the subject claim.

14

subject case.  *Onyeanusi* involved a discrimination lawsuit filed by an individual who purchased newspapers for resale and delivery within a defined geographical area for the Times-Picayune. *Onyeanusi*, 485 So.2d at 622.  The contract between the Times-Picayune and Onyeanusi identified him as an independent contractor.  *Id.*  The Times-Picayune obtained a dismissal of the claim based upon the contract interpretation and Onyeanusi appealed, contending that pursuant to Louisiana Revise Statute 23:1006, the Times-Picayune should be held liable.  *Id.*

 In the context of the private contractual relationship at issue, the *Onyeanusi* Court noted that there was no evidence that the Times-Picayune compensated the plaintiff.  In affirming the lower court, the Court noted that when a customer made payment to the newspaper rather than the plaintiff, the newspaper would  pro-rate the amount owed it by the plaintiff and send the balance to the plaintiff.  *Id.* at 623.   This case is completely different than the subject case and as such does not form a basis for interpreting the statute.  Consequently, the request to dismiss Dorgan's state sex discrimination claims against Mayor Foster because he is not her employer is denied.

     5.     **<u>City of Hammond Dismissal of Age and Sex Claims</u>**

     a.     **<u>Legitimate Non-Discriminatory Reason for Discharge.</u>**

The  City of Hammond contends that Dorgan's claims of age and sex discrimination should be dismissed  as a matter of law because she cannot establish that she was discriminated against on either basis.  The City contends that it had a legitimate non-discriminatory reason for eliminating her position and she voluntarily resigned.  Consequently, it contends that it cannot be held liable for either sex or age discrimination.

Dorgan contends that  her age and sex discrimination claims should not be dismissed.  She alleges that the Mayor Foster's job elimination reason was pretextual and that the real purpose  for

removing her was to remove a woman from the City's hierarchy of authority so that another male could replace her.

Title VII prohibits an employer from discharging an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). The AEDA makes the same prohibition based on age. *See* 29 U.S.C. § 623(a)(1). The burden shifting analysis under Title VII and the AEDA is the same, *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999); *Meinecke v. H & R Block,* 66 F.3d 77, 83 (5th Cir.1995), and, therefore, these claims will be addressed together.

Under the burden shifting analysis, the plaintiff must first establish a prima facie case of discrimination. *Meinecke,* 66 F.3d at 83. Once established, the prima facie case raises a presumption of discrimination, which the defendant must then rebut by demonstrating a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant satisfies this burden, then the presumption disappears, and the plaintiff must show that the defendant's reasons are a pretext for discrimination. *Id.*

Under Title VII, a plaintiff makes a prima facie case for gender discrimination by proving (1) that she is a member of a protected class, (2) that she was qualified for the position, (3) that she suffered adverse employment action, and (4) that either she was replaced by someone not in the protected class, or others similarly situated were treated more favorably. *Okoye v. Univ. of Tex. Houston Health Science Ctr.,* 245 F.3d 507, 512-13 (5th Cir.2001). When the employer does not replace the plaintiff, then the fourth element instead requires the plaintiff to show that others who are not in the protected class remain in similar positions. *Bauer,* 169 F.3d at 966 (citing *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990)).

Under the AEDA, the first three elements of a plaintiff's prima facie case are the same.  *Id.* (citing *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993)). For the fourth element under the AEDA, the plaintiff must show that she was replaced by someone outside the protected class or someone younger, or was otherwise discharged due to age. *Id*

The City concedes that Dorgan can establish a prima facie case of sex discrimination. However, it contends that her age claim is not viable because of jurisdictional issues.  Having already determined that jurisdiction over Dorgan's ADEA claim is proper, the Court finds that Dorgan can state a prima facie case of age discrimination as Hudgins, the Airport Director that replaced her, was not in the protected class because he was 30 years old at the time he replaced her.

The City therefore is required to present a legitimate non-discriminatory reason for its action. The City, however, only attempts to present a reason for eliminating the position of Airport Director. According to the City, Mayor Foster testified that he consulted with several individuals and decided that it was in the City's best interest to eliminate the position of Airport Director.  (*See* Foster at 55-56, Def. Ex. 15; Foster State Court Aff., Def. Ex. 17).  Foster indicated that he believed that the duties could be assumed by the Airport Advisory Board members and he was hoping to reestablish an Airport Authority which would obviate the need for an Airport Director.  (*See* Foster at 31-32, Def. Ex. 15; Foster State Court Aff., Def. Ex. 17).  He also concluded that after consulting with "individuals," that Dorgan was not doing a "stellar job" and he felt that abolishing the position would be in the best interest of the City.  ( *See* Foster at 110-111, Def. Ex. 15).

In contrast, Dorgan contends that the City's explanation is pretextual because Foster was only in his job for a few weeks, and that even though he was unfamiliar with the responsibilities of the Airport Director he decided to eliminate her position. (*See* Pl. Ex. 5 at 13-14). She contends that

while he was unaware of the job duties of the Airport Director, the City's ordinance sets forth the duties and indicates that the Airport Director had full authority over the management of the Hammond Airport.  (Pl. Ex. 9; Def. Ex. 14).  She therefore contends that he simply sought to replace her with a younger male which occurred when Hudgins replaced her.

The Supreme Court has held that a plaintiff must present evidence establishing not only that the enunciated reasons for her discharge are false, but also that they operated as a pretext for discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515 (1993). Thus, a plaintiff must go beyond merely refuting the nondiscriminatory reasons advanced by her employer, and provide specific evidence of discrimination, "such as 'direct' evidence of . . . discrimination, information about the [attributes] of other employees in plaintiff's position, the treatment and evaluation of other employees, or the employer's variation from standard evaluation practices." *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1508 (5th Cir.1988).

The Fifth Circuit has adopted a two-part test for determining if a plaintiff can avoid summary judgment on the question of pretext: if the evidence, taken as a whole: (1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) creates a reasonable inference that age and gender was a determinative factor in the actions of which plaintiff complains." *Rhodes v. Gutberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996).

The Court notes that while the City contends Foster sought to restructure City Government, the evidence shows that the he did not have the right to reorganize City Government.  He could only propose to the Council the reorganization.  In order for the reorganization to take place, he was required to submit a written plan to the council and a hearing was required to be held within 30 days. (*See* Pl. Ex. 1)

Additionally, after Dorgan no longer worked as the Airport Director, she was replaced by a younger male who was hired in the position of Airport Director rather than transferring the duties to the Airport Authority, the stated reason for her termination.   Further, there is no evidence that the City Council authorized the administrative restructuring of the Airport Administration resulting in the abolishment of the position of Airport Director.

The record further shows that the individual who replaced Dorgan was a male under the age of thirty, Byron S. Hudgins.  Hudgins was formally a member of the Air Force Reserve who worked as a pilot with the 53rd Weather Reconnaissance Squadron, the "Hurricane Hunters" who worked out of Keesler Air Force Base in Biloxi, Mississippi.  (*See* Pl. Ex. 8).  Hudgins  had a high school diploma and some flight experience.  There is no evidence in the record that he was experienced in airport operations, airport construction or maintenance.  Mayor Foster was also quoted as saying that Hudgins "youthful vitality" was a factor in the determination.  (*See* News Article, Pl. Ex. 8).

The evidence also shows that Hudgins was then replaced by an even younger male, Jason Bell a recent college graduate who did not possess the minimum five years of supervisory experience in aviation, airport operations, airport construction or airport maintenance as required by the advertisement for the position.[9]  ( *See* Pl. Ex. 11, 12, Def. Ex. 16).   There is no evidence that

---

[9]The Job Description for the Position of City Director in July 2003 reads as follows: City of Hammond Airport Director...responsible for the overall economic development and improvements to the Airport.  Required to supervise employees and contractors engaged in various phases of airport business, operations, construction and maintenance.  Candidate must exercise considerable independent judgment in directing the activities of the airport.  Related skills include working knowledge of FAA regulations and applicable federal, state and local laws, regulations and ordinances; modern methods, procedures, practices, tools and materials employed in the operation of the airport facilities; and effective communication in diverse business settings.  Must plan, coordinate work, and initiate departmental procedures and operations improvements  and operations improvements and design, assign and coordinate various complex airport maintenance projects and maintain close relationships with airport tenants, federal, state and municipal agencies.  Must meet city bonding requirements.  Bachelor of Science or equivalent job related experience with a minimum of 5 years of managerial experience in aviation management, airport operations, airport economic development or related technical field.  College courses in airport management or related field may be substituted for three years supervisory experience., Salary range $37K-46K. Forward resume to Attn: Director of Personnel, City of Hammond, P.O. Box 2788, Hammond, La  70404, Deadline 12 Noon, July 22, 2003 EOE. (PEx.##11, 12, DEx #16)

he had any type of aviation experience. Whether the actions taken by the City were legitimate non-discriminatory reasons or simply pretextual explanations for hidden discrimination is a question for the jury to decide.[10]   The Court finds that there are genuine issues of material facts regarding Dorgan's age and sex and/or gender discrimination claims and the City's request to dismiss these claims is denied.

### b.       No Adverse Employment Action, Voluntary Resignation

The City next contends that Dorgan's discrimination claims should be dismissed because she voluntarily resigned.  It alleges that it took no adverse action terminating her employment, Dorgan simply resigned.  As evidence of her voluntary resignation, the City notes that she announced to several other employees that she would be resigning the next day.

Dorgan contends that she was constructively discharged and points to the defendants' attempt to terminate her on January 27, 2003 under the guise of restructuring the City's administration as evidence of her constructive discharge in April.  She complains that only after seeking relief in the state court was she temporarily restored to her position.  Further, she contends that when she was restored to the position, the Mayor sought information from others regarding airport related issues.  She complains that the straw that broke the camel's back was the Director of Personnel's insinuation that she had been drinking on the job on April 23, 2003.

Constructive discharge is an adverse employment action for the purposes of Title VII and

---

[10]See *McDonnell Douglas Corp. v. Green.,* 411 U.S. 792 (1973); *St. Mary's Honor Cir.,* 509 U.S. 502); *Rhodes,* 75 F.3d at 994 (concluding that "age need not be the sole reason for the adverse employment decision; however, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in  [the employer's decision making process] and had a determinative influence on the outcome.") (internal citations omitted); *Bodenheimer,* 5 F.3d at 957 ( noting that "[t]o prevail ultimately, the plaintiff must prove, through a preponderance of the evidence, that the employer's reasons were not the true reason for the employment decision *and* that unlawful discrimination was.) (citing *St. Mary's Honor Cir.*)

the ADEA. *Jordan v. Clark,* 847 F.2d 1368, 1377 (9th Cir.1988). Constructive discharge occurs when an employer intentionally creates, or knowingly permits, conditions so intolerable that they effectively force an employee to resign. *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir.1998). The standard for determining constructive discharge is an objective one. *Watson v. Nationwide Ins.*, Co., 823 F.2d 360, 361 (9th Cir.1987).

To survive summary judgment on a claim for constructive discharge, Dorgan's working conditions must have been "so intolerable that a reasonable employee in her position would [have felt] compelled to resign.*" Hockman v. Westwood Commc'ns, L.L.C.,* 407 F.3d 317, 331 (5th Cir.2004)(quoting *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 539 (5th Cir.1998)). She must also show the existence of aggravating factors, not merely harassment. *Id.*

Courts consider the following factors when analyzing constructive discharge claims: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Id.* at 331-32 (citing *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir.2001)). The plaintiff must ultimately show a greater degree of harassment than that required for a hostile work environment claim. *Id* at 332.

The record shows that Dorgan was terminated from her job on January 27, 2003. She sought relief in the state court and was restored to the position on January 28, 2003 and the Mayor and the City were ordered to return all powers and duties and emoluments of office to her no later than January 30, 2003. (*See* Def. Ex. 23).

The City complied with the order and on January 30, 2003, the Personnel Director advised the Finance Director that Dorgan's separation was rescinded and further requested that she receive compensation for 16 hours of administrative leave.  (*See* Def. Ex. 24).  Yet, the Mayor testified that he felt that Dorgan's performance was so deficient that her position should be eliminated even though he did not know exactly what her duties were.  (*See* Foster at 123, Def. Ex. 15).  He testified that he made that determination based upon the input of Judge Ford, Mr. Wigninton, Mr. Yokum and Dr. Jones.  *Id.* at 124.

The testimony of Dorgan is that the precipitating event which gave rise to her constructive discharge occurred on April 23, 2003 when the Director of Personnel, Severan, accused her of smelling like alcohol during a meeting.  The City acknowledges that it has a very strict policy against alcohol use in the work place, but that Severan was "personally concerned" about Dorgan, and that even though Dorgan offered to submit to a urine test, the City declined.

Severan also acknowledges by affidavit that she did not even write Dorgan up for the perceived offense.  (Def. Ex. 29).  This statement, however, begs the question that if Severan was concerned about Dorgan's well being, why did she, according to the Mayor, advise him of her suspicion during a point when there was a break in the meeting?  (Foster at 123, Def. Ex. 15).

Whether Severan's accusation of alcohol consumption was  an attempt to humiliate Dorgan to encourage her to quit such that it constitutes constructive discharge is a question for the jury.  Further, the Court notes that Dorgan and the City continued to operate pursuant to the TRO entered by the state court through the date her employment ended and they were required to restore her rather than abolish her position.

Additionally, Dorgan testified that she construed Severan's actions as harassing because

both Jones and Severan were involved in the City's decision to abolish her position and transfer her duties.  However, her position was never abolished.  (*See* Foster at 98 Def. Ex. 15).

   While the evidence of record shows that the preliminary injunction hearing was scheduled for March 3, 2003, there is no record of whether it took place or why it did not take place.  The City contends that sometime after Dorgan was restored to her position by Court order, it decided not to pursue reorganization.  Yet, it did not advise Dorgan of its decision nor does it provide the Court with a date when the decision was actually made.

Further, the City never sought a dismissal of the TRO because they decided not to pursue the reorganization and thus there was no further threat of harm to her being terminated.  The record does show that after Dorgan's employment ceased, on May 14, 2003, both parties, filed a Joint Motion and Order of Dismissal seeking a dismissal of her claim for Preliminary Injunction.  (*See* Def. Ex. 26).

Additionally, Dorgan contends in support of her position that she was constructively terminated that even though the Mayor restored her to her position as the state court judge ordered, he seemed to go around her as she attempted to perform her duties.  In her deposition, she testified that the Mayor put items on the Council's agenda concerning the Airport but that as the Airport Director, she was not made aware of those issues.  She testified that one of the items concerned a runway extension contract with the Department of Transportaion, a second item concerned taxes on one of the hangars, and a third item  was an agenda item for resurrecting the Airport Authority.  (*See* Dorgan at 119-120,  Def. Ex. 1).

The record also shows that on April 2, 2003, Dorgan emailed the Mayor an inquiry about the public bid law and whether it applied to the aircraft hangars.  (*See* Def. Ex. 27,  D0572).  The

Mayor responded that Dr. Jones was looking into her inquiry.

On April 16, 2003, Dorgan followed up by email because she had not heard anything on this issue and the Mayor told her that she could come by on April 17 to discuss the issue.  (*See* Def. Ex. 27, D0871).  It is unclear from the record whether the meeting actually took place.

The record further shows that Dorgan followed up on a March inquiry sent to the Mayor regarding  whether $5300.00 could be moved from one category to another to pay an engineering firm for pre-engineering work.  (*See* Def. Ex. 27, D0574).  The Mayor responded to her follow up inquiry of April 16, 2003 on that same day  but sent a question back to her regarding whether the payment would be reimbursable.  (*See* Def. Ex. 27, D0574).  Its unclear from the record before the Court whether he received an answer to his question.

Whether Dorgan's decision was voluntary or the result of constructive discharge in light of the fact that she was working pursuant to a court order, accused of consuming alcohol while in the work place which was reported to the Mayor, and working for a Mayor who believed that she was incompetent, is a genuine issue of material fact to be resolved by the jury.  Accordingly, the defendant's motion to dismiss her discrimination claims is denied.

### B.    Dorgan's § 1983 Claims

#### 1.    Property Interest

The Mayor and the City of Hammond contend that Dorgan's § 1983 claim should be dismissed because she was an at will employee and could be terminated at any time.   According to the defendants, the essence of Dorgan's claim is that Mayor Foster allegedly violated her procedural due process rights under the Fourteenth Amendment when he failed to grant her a pre- and/or post-termination hearing.   The defendants contend that Dorgan's § 1983 claim should be dismissed

24

because Dorgan was simply an at will employee and therefore she cannot establish that she had vested property right in continued employment.

In contrast, Dorgan contends that she had a vested property right in her continued employment and could be only terminated for cause. She therefore requests that the defendants' motions be denied.

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 569 (1972). "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth,* 408 U.S. at 576.

The person must have a legitimate claim to those benefits, not simply an abstract need or unilateral desire. *Id.* To determine if property rights exist, the court must look to state law. *Id.* at 578; *see also Bishop v. Wood,* 426 U.S. 341, 344, (1976) (discussing the issue in the specific context of employment law).

When a public employee has a legitimate entitlement to his employment the Fifth Circuit has observed that, "the due process clause may protect as 'property' no more than the status of being an employee of the governmental employer in question together with the economic fruits that accompany the position." *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 754, n. 3 (5th Cir.1986).

The Fifth Circuit has generally rejected claims of entitlement to a particular employment position if the claimant gets the same pay and benefits in the new position. *See e.g., Kinsey v. Salado Indep. Sch. Dist.,* 950 F.2d 988 (5th Cir.1992) (finding no property interest in the position of superintendent where the plaintiff fails to point to any provision of the Texas Education Code or

any other rule-making source bestowing a property interest in the non-economic benefit of the duties and responsibilities as superintendent); *Kelleher v. Flawn*, 761 F.2d 1079 (5th Cir.1985) (finding that instructor demonstrated no property interest in teaching specific government classes where there was no contract guaranteeing the right to teach those classes).

In other words, in this Circuit, public employees generally have no protectible property interest in their employment *position,* so long as they continue to receive the same salary and benefits in some other employment position, unless, as *Roth* instructs, some outside expectation or understanding creates a protectible interest.  This conclusion seems to be a balance between *Roth* and the case law in the Fifth Circuit.[11]

In 1981 the Fifth Circuit held that a government employee who was demoted, but remained at the same salary level, could nevertheless establish a protectible property interest in his job position because there was a mutually-recognized entitlement by reference to local rules and understandings surrounding his employment.  *Winkler v. County of DeKalb*, 648 F.2d 411 (5th Cir.1981) (holding that the county code and the conduct of the parties established the existence of rules or mutually explicit understandings supporting the plaintiff's claim of entitlement to his position).  Dorgan seeks the shelter of *Winkler.*  The Court agrees.

Under Louisiana state law, "a person employed for an indefinite period is an employee at will."  *Wallace v. Shreve Memorial Library*, 79 F.3d. 427, 429 (5th Cir. 1996).  Courts have noted that "an at-will employee is free to quit at any time without liability to his or her employer and may

---

[11]*But see  e. g.*, *Debra P. v. Turlington*, 644 F.2d 397, 403-04 (5th Cir. 1981) (concluding that state-created expectation of diploma upon successful completion of high school supports claim to entitlement); *Glenn v. Newman*, 614 F.2d 467, 471-72 (5th Cir. 1980) (holding that city rules stating possible grounds for dismissal created expectation of continued employment absent noncompliance); *Hennessey v. Nat'l Coll. Athletic Ass'n*, 564 F.2d 1136, 1145-46 (5th Cir. 1977) (affirming district court's conclusion that university's policies and practices constituted a "common law" of the institution giving rise to a property interest); *Zimmerer v. Spencer*, 485 F.2d 176, 177-78 (5th Cir. 1973) (noting that property interest may arise from employer's words and actions whose meaning is found in usage of the past).

be terminated at any time, for any reason or for no reason at all, provided the termination does not violate any statutory or constitutional provision." *Id (internal citations omitted).* Further, "[a]ny ambiguity should be construed in favor of employment at-will." *Id.*

According to the record, the Charter of the City of Hammond provides that the Mayor has the power and duty to "appoint and suspend or remove for just cause all City employees and appointive administrative officers provided for, by, or under this charter, except as otherwise provided by law, this charter, civil service or other personnel rules adopted pursuant to this charter." (City of Hammond's Home Rule Charter, Def. Ex. 12 at 12).  In July 1997, the City Council and Mayor passed an ordinance adopting a new personnel policies and procedure manual for city employees  which sought to convert City employees to at will employees.  (*See* Def. Ex. 7).

However, the record shows that when Dorgan was hired on March 15, 2002, Severan, as the Personnel Director for the City of Hammond, wrote a letter to her confirming employment.  In so doing, the letter provided the following language:

> Since there is no guarantees, however, it is understood that your employment is for no specific length of time.  That is , the City of Hammond may terminate your employment *at any time with or without cause during the first six-(6months)* of employment and you may do the same.  After satisfactory completion of the required Introductory Period, your status will change to that of a full-time employee as governed by the City's personnel's policies.

(Def.  Ex 3).

The letter from Severan  indicates that the ability to terminate Dorgan at will existed during the six month probationary period .  Additionally, as noted above,  Mayor Foster's duties provided that the Mayor could appoint and suspend or remove for just cause all City employees and "appointive administrative officers." (Def. Ex. 12 at 12).  At the time the Mayor sought to eliminate the position and terminate Dorgan, she was employed with the City for eleven months and nine days.

He testified that one of the reasons he sought to remove Dorgan was because he perceived that she was not competent. (Foster, at 124, Def. Ex. 15).

Consequently, whether Dorgan reasonably expected that she would not be terminated at will because she worked beyond the six month period such that she had a property interest in continued employment is a question of material fact. As a result, the defendants request to dismiss her § 1983 claim on the basis that she did not have a protectable property interest in her employment is denied.

### 2. Under Color of Law

#### a. The Mayor

##### 1. Due Process Violation

Having concluded that whether Dorgan had a protectable property interest in her employment is a question for the jury, the Court turns to whether she can state a claim against Mayor Foster. The Mayor contends that Dorgan's assertion that her position could be terminated only after obtaining approval by the City Council is without merit. He further contends that even if Dorgan is correct that he could not abolish her position without council approval, she remained an at will employee subject to dismissal.

Dorgan, however contends that the Mayor's attempt to abolish her position was contrary to federal and state laws as well as local ordinances. Consequently, his actions give rise to liability under § 1983.

Under its express language, § 1983 claims may be brought against a government official who *causes* another to be deprived of constitutional rights:

> [e]very person who, under color of any statute, **ordinance,** regulation, custom, or usage, of any State . . . subjects, or ***causes to be subjected,*** any citizen . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other

proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).

For instance, an official can be held liable if he wrongfully instigates events which lead to a deprivation of constitutional rights: Any official who 'causes' a citizen to be deprived of [her] constitutional rights can . . . be held liable.  The requisite causal connection is satisfied if the [official] sets in motion a series of events that the [official] knew or should reasonably have known would cause others to deprive the plaintiff of [her] constitutional rights." *Connor v. Reinhard,* 847 F.2d 384, 396-397 (7th Cir.1988). *See also Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 569 (1st Cir.1989); *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).

The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. Accordingly, the first step in analyzing a procedural due process claim is to determine whether the "asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000) (internal quotations omitted).

Dorgan claims that she possessed a property interest in her job.  The Due Process Clause provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures.

Furthermore, a defendant in a civil rights action must have personal involvement in the alleged wrongs.  Liability cannot be predicated solely on the operation of respondeat superior. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 692-695 (1978); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) ( *citing Parratt v. Taylor ,* 451 U.S. 527, 537 n.

3, (1981).

Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.  *Rode,* 845 F.2d at 1207.

In this case, Dorgan alleges that Mayor Foster decided to abolish her position so that he could replace her with a male.  The Mayor concedes that he decided to eliminate Dorgan's job.  (*See* Foster at 30, Def. Ex. 15).  He testified further that he considered the possibilities of reimplementing the Airport Authority to its full capacity and believed that the Director position  was no longer necessary and that the Authority could select its own Airport Director.  *Id.* at 54.

However, as noted above, Severan's May 2, 2002 letter indicated that Dorgan's at will status would last for as long as she was on probationary status.  The record shows that at the time the Mayor sought to eliminate the position and terminate Dorgan, she had been employed with the City for eleven months and nine days.

Further, the Personnel Policy for the City provides that employees whose conduct is unsatisfactory will be subject to a progressive disciplinary action  policy.  (*See* Def. Ex. 10, D0352-0353). According to the manual, the purpose of the discipline is to allow the employee to know that their conduct or performance is unacceptable and give them an opportunity to improve.  *Id.*  If the performance does not improve then a meeting will be scheduled with the employee and the Director of Personnel.  *Id.*

Whether Severan's March 15, 2002 letter transformed Dorgan's employment status from at will to for cause termination only entitling her in the absence of cause to continued employment , is a question of material fact.  Accordingly, whether the Mayor's termination of Dorgan without

using the progressive disciplinary process and meeting requirements set forth in the Personnel Manual violated her due process rights is also a question of material fact.  Therefore, the Mayor's request to dismiss Dorgan's § 1983 claim is denied.

## 2.    <u>Qualified Immunity</u>

The Mayor contends that  even if Dorgan  had a property interest in continued employment, he should be immune from individual liability under § 1983 because his conduct does not violate clearly established statutory or constitutional standards.  Dorgan does not address this issue in her opposition.

The Court notes that Dorgan does not state whether she is pursuing her § 1983 claim against Foster in his official capacity or his individual capacity.  In this Circuit, courts look to the course of proceeding to determine the nature of the lawsuit, often looking to the complaint to determine the capacity.  *U.S. v. Regents of the Univ. of Cal.*, 363 F.3d 398, 402-403, (5th Cir. 2004); *Goins v. State of La.*, CIV.A.04-1159, 2004 WL 2694899 (E.D.La. Nov. 22, 2004).  The Court notes that when discussing Foster's alleged restructuring of the Hammond Airport, Dorgan's complaint alleges that such restructuring was, and is, ultra vires and beyond the discretionary power of the Mayor.  (*See* Rec. Doc. No. 1).  Thus, Dorgan contends that any restructuring would necessarily been outside the bounds of mayoral power and thus Foster acted in his individual capacity.  Accordingly,  the Court concludes that she attempts to state a § 1983 claim against him in his individual capacity.

In order to prevail in a § 1983 action for civil damages from a government official performing discretionary functions in their individual capacity, the defense of qualified immunity requires that the official be shown to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  The qualified immunity defense rests upon a determination of the "objective reasonableness of [the defendant official's] conduct as measured by reference to clearly established law." *Id.* As clarified by *Anderson v. Creighton,* 483 U.S. 637, 640,(1987), in order for the defendant's qualified immunity to be abrogated:

> the right the official is alleged to have violated must have been clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . , but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Statutory or constitutional rights are clearly established such that a reasonable person would have known of those rights if (1) the right in question is defined with "reasonable specificity," (2) the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) under preexisting law, a reasonable defendant official would have understood that his or her acts were unlawful.  *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1064 (2d Cir.1993).

The applicable Circuit law is clear that a property interest  in continued employment may be created by the words and  actions of the employer.  *Winkler*, 648 F.2d at 414.  Therefore, Mayor Foster should have been put on notice that the letter sent by the City's Director of Personnel, whom he delegated the responsibility of exercising personnel matters to, contained information suggesting that after the six month period, Dorgan's at will status would be eliminated.

For purposes of the second prong of a qualified immunity analysis, the Court examines whether the officials alleged conduct was objectively reasonable.  The objective reasonableness determination turns on whether a reasonable official could be believe that his conduct was lawful,

32

in light of the clearly established law and information possessed by the official.   *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1988)

   An objectively reasonable Mayor should have known that he was acting without regard to clearly established law and communications by the City's own Personnel Department.  He should have known that Severan indicated that Dorgan's at will status would last for a six month period which may entitle  her to due process or progressive discipline.   He should have known that the City charter indicated that he could terminate employees for cause.

   Even though Mayor for only twenty six days,  an objectively reasonable Mayor would  have reviewed Dorgan's personnel file which contained the subject letter indicating that  her at will status terminated at the end of six months.  Furthermore, an objectively reasonable Mayor also would have made himself familiar with the ordinances for the City which would have informed him of his responsibility in terminating employees.  (Foster at 20, Def. Ex. 15).  The Mayor is therefore, not qualifiedly immune from being sued in his individual capacity.

   **b.**   **Section 1983 Claim against the City of Hammond**

   Next, the City of Hammond seeks dismissal of  Dorgan's § 1983 claim against it because she cannot point to a policy statement, ordinance, regulation or decision in which the municipality supported the decision to violate her rights.  Dorgan does not respond to this issue.

   In order to obtain a judgment against a municipality, a plaintiff must prove that the municipality itself supported the violation of rights alleged.  *Monell,* 436 U.S. at 692-695.  Thus, §1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id*. at 694.

In the subject case, there is no government policy that contributed or caused any injury to Dorgan.  The only policies at issue are the at will policy and the government rule indicating that the Mayor may terminate for cause.   To the contrary, the suggestion of Dorgan is that the Mayor failed to follow City policy when he attempted to abolish her position because he was required to seek approval from the City Council before doing so.  The Court therefore finds that there is no question of material fact regarding whether a policy existed that violated her constitutional rights such that she could state a claim under *Monell*.  Accordingly, her § 1983 claim against the City is dismissed.

### C.   <u>Intentional Infliction of Emotional Distress Claim</u>

The defendants final argument is that Dorgan's claim of intentional infliction of emotional distress should be dismissed as there is no evidence that she was intentionally subjected to outrageous and uncivilized conduct by the Mayor or his employees.

Dorgan contends that her work conditions were extreme, outrageous and illegal in nature. She contends that as a result of the defendants actions and omissions, she began to suffer stress and anxiety which caused her to incur medical expense and need medical attention.

To recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto Co.,* 585 So.2d 1205, 1209 (La.1991); *accord Deus v. Allstate Ins. Co.,* 15 F.3d 506, 514 (5th Cir.1994).

Under the first prong of the *White* test, the defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious and intolerable in a civilized community.  Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  *White,* 585 So.2d at 1209. Mere violation of laws regulating conduct in the workplace is not enough to establish intentional infliction. *Skidmore v. Precision Printing & Pkg., Inc.,* 188 F.3d 606, 613 (5th Cir.1999).

The second prong of the test requires that the distress suffered must be such that no reasonable person could be expected to endure it.  Liability arises only where the mental suffering or anguish is extreme. *White*, 585 So.2d at 1210.

As to the third prong of the *White* test, the acts must be intentional in the sense "that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that  the  result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Id.* at 1208.

Ordinary employment disputes, even those involving discrimination and sexual harassment, will rise to the level of intentional infliction of emotional distress only in the most unusual of cases. *Barber v. Marine Drilling Mgmt., Inc*., CIV.A.01-1986, 2002 WL 237848 at *8 (E.D.La. Feb. 15, 2002).  Further, "this state's jurisprudence has limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time."  *Mayes v. Office Depot*, 292 F.Supp.2d 878, 889 (W.D.La. 2003).

 For example a former vice president with thirty years experience, who was demoted to warehouse supervisor, whose duties consisted of "housekeeping chores around the warehouse's shipping and receiving area [and] was frequently required to sweep the warehouse, stated a claim for intentional infliction of emotional distress. *Wilson v. Monarch Paper Company*,  939 F.2 1138, 1145 (5th Cir. 1991).  His duties were assigned to a  younger person, the President of the company

deliberately refused to speak to him in the hallway, and  managers at the company  would not work with him, referred to him as old, and  even prepared a sign stating that he was old.  *Id.* at 1145-1146.  However, absent the demotion to janitor, the other actions were insufficient, standing alone, to be considered extreme and outrageous.

Additionally, an employers actions were deemed outrageous where  the employer tried to prevent an employee from being transferred to a higher position by placing bank checks in plaintiff's purse in order to make it appear that she was a thief.  *See Deus,* 15 F.3d at 515 (citing *Dean v. Ford Motor Credit Co.*,  885 F.2d 300, 307 (5th Cir. 1989).  The employer also refused her request for transfer and chose a less qualified male.  *Id.*  However, despite this litany of unseemly conduct by the defendant, the court noted that it was only the check incident that made the conduct outrageous and allowed the plaintiff to state her claim for emotional distress.  *Id*.

Dorgan contends that the acts giving rise to her claim of intentional infliction of emotional distress  are: (1) the suggestion by Severan that she had  smelled of alcohol while on the job which she contends is an outrageous and baseless claim;  and (2) the Mayor's efforts at undermining her authority.

Dorgan complains that it was outrageous of the City Personnel Director to accuse her of smelling of alcohol and attempting to conceal it by sucking on candy during a department meeting.  She complains that the accusation caused her to immediately seek a sobriety test because she believed that the defendants were going to use this allegation to terminate her employment.  However, inquiring of an employee about whether alcohol had been consumed because the supervisor suspected that the employee was on the premises in violation of company policy is not so shocking that it  it rises to the level of outrageous conduct.

Dorgan also complains that the Mayor went around her and sought the help of others regarding airport issues.  She complains that he sought to undermine her authority.  However, going around an employee is not so outrageous so as to give rise to a claim for intentional infliction of emotional distress. Accordingly, the defendants are entitled to summary judgment on the Dorgan's claim of intentional infliction of emotional distress.

Accordingly,

**IT IS ORDERED THAT Mayor Mayson Foster's Motion for Summary Judgment (doc. # 29)** and the **City of Hammond's Motion for Summary Judgment (doc. # 32)** are **GRANTED IN PART AND DENIED IN PART as follows:**.

(1)     The defendants' request to dismiss Dorgan's intentional infliction of emotional distress claims is granted;

(2)     The defendants' request to dismiss Dorgan's state law age discrimination claims under Louisiana's Employment Discrimination Law is granted;

(3)     The City of Hammond's  request to dismiss Dorgan's § 1983 claim against it is granted;

(4)     Mayson Foster's request to dismiss Dorgan's Title VII, ADEA, and state law gender and/or sex discrimination claim under Louisiana's Employment Discrimination Law against him in his individual capacity, is granted;

(5)     The City of Hammond's request to dismiss Dorgan's age discrimination claim under the ADEA and her gender and/or sex discrimination claim under Title VI  is denied;

(6)     Mayson Foster's request to dismiss Dorgan's age discrimination claim under the ADEA and her gender and/or sex discrimination claim under Title VII against him in his official capacity is denied;

(7)     The defendants' request to dismiss Dorgan's state law claims of gender and/or sex discrimination under Louisiana's Employment Discrimination Law is denied;

(8)     Mayson Foster's request to dismiss Dorgan's § 1983 claim against him in his individual capacity is denied.

New Orleans, Louisiana, this _____21st_____ day of July 2006

_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**